

# NUMBER 13-22-00293-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

ANDREW SALAZAR RAMOS,                                               Appellant,

v.

THE STATE OF TEXAS,                                                 Appellee.

### On appeal from the 139th District Court
### of Hidalgo County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Tijerina
Memorandum Opinion by Chief Justice Contreras**

Appellant Andrew Salazar Ramos was convicted of four counts of aggravated sexual assault, a first-degree felony, *see* TEX. PENAL CODE ANN. § 22.021; one count of aggravated assault, a second-degree felony, *see id.* § 22.02(a)(1); and one count of aggravated kidnapping, a first-degree felony. *See id.* § 20.04. He was sentenced to eighty years' imprisonment for the first-degree felonies and twenty years' imprisonment for the

second-degree felony, with all sentences ordered to run concurrently.

Ramos challenges his convictions by eight issues on appeal, arguing: (1) the trial court erred by failing to re-evaluate his competency during trial; (2) the trial court erred by removing him from the courtroom during trial; (3) the trial court was biased, depriving him of a fair trial; (4) his trial counsel provided ineffective assistance; (5, 6, and 8) the trial court erred by admitting certain evidence; and (7) the State made an improper argument to the jury about his parole eligibility. We affirm.

## I. BACKGROUND

Counts 1 through 3 of the indictment alleged that Ramos intentionally or knowingly caused the penetration of the sexual organ and anus of Isabela Gomez[1] by his sexual organ and finger, without her consent, and in the course of the same criminal episode, caused serious bodily injury or attempted to cause Gomez's death by striking her with his hand, kicking her with his foot, and strangling her. *See id.* § 22.021(a)(1)(A)(1), (a)(2)(A)(i). Count 4 alleged that Ramos intentionally or knowingly caused the penetration of Gomez's mouth by his sexual organ, without her consent, while "caus[ing] or plac[ing] [her] in fear" that she would imminently suffer death or serious bodily injury. *See id*. § 22.21(a)(1)(A)(ii), (a)(2)(A)(ii). Count 5 alleged that Ramos, using a deadly weapon, intentionally, knowingly, or recklessly caused serious bodily injury to Gomez by striking her with his hand, kicking her with his foot, and strangling her. *See id*. § 22.02(a)(1), (a)(2). And Count 6 alleged that, with intent to inflict bodily injury on Gomez to violate or abuse her sexually, or to terrorize her, Ramos intentionally or knowingly abducted her by moving

---

[1] To protect the identity of the complainant, we refer to her by the pseudonym given to her in the indictment. *See* TEX. CONST. art. I, § 30(a)(1) (providing that a crime victim has "the right to be treated . . . with respect for the victim's dignity and privacy throughout the criminal justice process"); TEX. CODE CRIM. PROC. ANN. ch. 58, subch. C ("Confidentiality of Identifying Information of Sex Offense Victims").

her from one place to another or confining her and intended to prevent her liberation by using or threatening to use deadly force. *See id.* § 20.04(a)(4), (a)(5).

## A.      Competency Evaluation

Before trial, Ramos's court-appointed counsel filed a "Motion for Competency Examination" stating that, during their initial meeting, Ramos "generally seemed that he did not understand the gravity of proceedings and the consequences of pleading guilty to the offense charged." Psychologist Gregorio Pina III, Ph.D., was appointed to evaluate Ramos's competency to stand trial. *See* TEX. CODE CRIM. PROC. ANN. art. 46B.021. In a report dated May 17, 2019, Pina stated that Ramos "attempt[ed] to control the evaluation through a guarded, annoyed, and negativistic approach." According to Pina, Ramos "was articulate, detailed, but overly assertive in providing his defense plan that included evidence, witnesses and the alleged words of his attorney." Ramos told Pina that he had been assaulted while he was incarcerated, and therefore Ramos mistrusted "everybody except family and his [a]ttorney." The report states that Ramos's "negative insight contradicted his verbal abilities that included clear, deep essential issues as to his legal situation. In this fashion he demonstrated he was exaggerating symptoms of mental illness which appeared accompanied by primitive denial." Pina stated that Ramos was dismissive of his inquiries and provided "flippant" answers, although Ramos "demonstrated he understood the critical elements of competency to stand trial, by answering questions directly and succinctly, as if their elementary nature were being dismissed."

Pina's report contained the following additional pertinent findings:

- Ramos "is able to factually and rationally describe the charges" against him and

"demonstrated factually understanding the behaviors to which the charges refer";

- Ramos "is able to provide detailed information of the alleged crimes" and "is able to challenge information he disagrees with in the offense report";

- Ramos suffers from "paranoia toward the detention center" where he was allegedly assaulted, "which bears on his ability to disclose to counsel pertinent facts, events, and states of mind";

- Ramos "may or may not choose to assist his [c]ounsel in providing information as to events in question," though "this appears to be a volitional issue after careful probes";

- Ramos "provided plausible but also unreasonable account of his behaviors around the time of the alleged offense" and "is further able to provide an account of the behavior of relevant others around the time of the offense";

- Ramos "demonstrated he comprehends (legal, psychological and other) advice, but may choose not to take it";

- Ramos "demonstrated he had the capacity to make a reasoned choice about defense options (e.g.[,] trial strategy, guilty plea, plea bargain, proceeding pro se, pleading insanity, nolo contendere, etc.) without distortions";

- Ramos "possesses an ability to rationally apply knowledge to his current case and make decisions in his best interest";

- Ramos "has an appreciation of appropriate courtroom behavior" but "demonstrated he may not be able to manage his words, emotions and behavior in the courtroom";

- Ramos "was not psychotic with a caveat. That is, he demonstrated narrow delusions as to how his attorney should handle his 'case.' This included technicalities about the law which may be unrealistic. . . . The narrow delusions he experiences may or may not affect his ability to handle appropriate courtroom behavior as this vacillated within the evaluation. Part of the issue is not mental illness, but a stubbornness personality characteristic at this phase of his life";

- Ramos "demonstrated he mostly has the capacity to testify relevantly during evaluation, but may jump to another topic that has to do with his defense strategy";

- Ramos "demonstrated he could poorly manage his emotional and communicative difficulties during an evaluation by disagreeing, and by analogy to a trial."

Overall, Pina concluded in his report that Ramos was competent to stand trial, and he recommended "[n]inety day inpatient treatment with enforced medications for Major Depressive Disorder."

In a separate "Certificate of Psychological Examination for Mental Illness," Pina stated that he diagnosed Ramos with major depression "with [n]arrow [d]elusions with primitive denial and oppositionalness." The certificate further stated that

> [Ramos] is mentally ill, and that, as a result of that illness, [he] will, if not treated, continue to suffer severe and abnormal mental, emotional or physical distress and will continue to experience deterioration of [his] ability to function independently and make a rational and informed decision as to whether or not to submit to treatment.

On May 28, 2019, the trial court signed a "Judgment of Competency" stating that it had

considered Pina's report and determined that Ramos was competent to stand trial.[2]

## B.    Trial

At trial, officer Genardo Gonzalez of the Edinburg Police Department testified he and other officers were dispatched on October 7, 2019, to apprehend a suspect at a ranch on Benito Ramirez Road. Gonzalez spoke with the ranch's owner, who advised him that Ramos was at the property earlier and had asked for the key to a red Ford Mustang. Another officer then reported locating the Mustang at a hotel on East Canton Road. Officers received information that Ramos was staying at a particular room in that hotel, so they prepared to forcibly enter the room. When the officers announced their presence, Ramos opened the door and let them in. Gonzalez observed Gomez on the bed in the room without clothes, but he did not see her condition. As officers arrested Ramos, he "was making statements to the other officers and being a little uncooperative and being a little aggressive." Gonzalez denied that he was questioning Ramos at the time; however, he conceded that officers asked Ramos whether he had anything on him.

Bodycam recordings of police activity at the ranch and at the hotel were admitted into evidence. It is undisputed that Ramos was not administered *Miranda*-type warnings at the hotel or while he was being taken into custody.

Gomez testified that, in early October 2017, she worked as a waitress at a strip club. At around 2:00 a.m. on the morning of October 9, around closing time, Ramos approached Gomez, "grabbed [her] hand," "sat [her] down on his lap," and began kissing

___

[2] The May 28 order noted that "neither the State nor the Defendant hav[e] requested a trial before judge or jury on the issue of incompetency, and neither party oppos[ed] an uncontested finding of competency by the Judge of this Court . . . ." The record also contains a separate "Uncontested Agreement of Competency and Waiver of Hearing" signed by Ramos and his attorney, stating that "[w]e agree with the findings of [Pina's] report that [Ramos] is competent to stand trial."

her. Gomez stated it was not unusual for customers to act this way. Gomez stated that Ramos wanted to take her to a "private room," but that was only for "dancers," not waitresses. Security then asked Ramos to leave because the club was closing. Gomez stated she tried to call her husband to pick her up, as she usually did at closing time, but he did not answer. She then intended to ask her friend and co-worker for a ride home, but she saw that her friend's car was not in the parking lot. Ramos then approached her and asked if she needed a ride home. She said yes and they left in Ramos's car.

Gomez said Ramos began driving recklessly on the expressway, so she asked to be dropped off at Walmart. Ramos drove the car to the back of a nearby Walmart and stopped. He told Gomez to sit in the backseat and she complied. Gomez testified:

> He opened the door and he sat down next to me. And he told me, do you want money. And I just said, no. And I just turned this way. And he said, take off your shorts. He pulled on them. And then I tried to open the handle and that's when he reached over my hand and closed the door shut. And that's when he started punching me.

Gomez testified Ramos continuously punched her in the face and choked her until she became lightheaded and was eventually "knocked out." She could not recall if Gomez contacted her sexually in the backseat of the car, nor could she recall telling the nurse who examined her that she had been sexually assaulted in the Walmart parking lot. She denied that she had a weapon or that she threatened Ramos.

Gomez stated she next remembered waking up naked, with her eyes swollen shut, in the back of a moving truck. Gomez said that when the truck stopped, Ramos grabbed her by the legs and dragged her out of the truck; he then grabbed her by the hair and dragged her for another short distance. At that point, Gomez heard two other voices asking Ramos what he had done. When Gomez pleaded with the unknown individuals to help her, Ramos started kicking Gomez "all over" her body. According to Gomez, Ramos

7

instructed the others to "do whatever you want with her, kill her or do whatever you want with her and just throw her wherever but just take her." She recalled that one of the voices responded to Ramos, "we're not going to help you this time." Ramos then dragged Gomez by the hair to a grassy area, kicked her again, and told her: "[I]f you try to run away again I'm going to kill you." After that, the next thing Gomez remembered was waking up inside a small parked car and hearing Ramos threaten to kill her if she made noise. At some point, Ramos left the car, and when he returned several minutes later, he took Gomez out of the car, wrapped her in bedsheets, dragged her to a room, and threw her on the bed. Gomez said that Ramos put her in the shower and sexually assaulted her there and on the bed. He told her that if she did everything he said, then he would take her back home to her family. He later said that he was going to leave for a month and would come back when Gomez healed. At some point, police entered the room, arrested Ramos, and took Gomez to the hospital for treatment.

Sexual assault nurse examiner (SANE) Rosa Aguirre testified that she examined Gomez that evening. At the time, Gomez presented with a "very swollen" and bloodied face and reported that she had been physically and sexually assaulted. Aguirre identified injuries to Gomez's vagina and anus. She identified various photographs of Gomez's injuries, which were entered into evidence. Written records from the examination were also admitted into evidence, over defense counsel's authenticity and hearsay objections.

Three Texas Department of Public Safety analysts—Alejandro Vasquez, Max Flores, and Maria Trevino—examined forensic material recovered from the SANE exam. Vasquez stated that he examined several swabs, as well as blood and saliva samples

8

taken from Gomez, and saliva and hair samples taken from Ramos.[3] He stated that cervical and anal swabs, fingernail clippings, and a left forearm swab taken during the SANE exam tested presumptively positive for the presence of blood. Vasquez forwarded the forensic material to Flores for additional testing. Flores testified that he examined the items in 2018 and found a small amount of "male DNA" present in the cervical and anal swabs taken during the SANE exam. He forwarded cervical, anal, and oral swabs to the DNA lab for "differential extraction." Trevino[4] testified that she was the "technical reviewer" at the DNA lab and reviewed the report prepared by a different analyst. According to Trevino, the analyst found DNA consistent with Gomez's DNA profile on the swabs, and Ramos was excluded as a contributor. The analysis did not detect the presence of sperm cells in any of the samples.[5]

## C.      Verdict

The jury convicted Ramos on all six charged offenses and assessed punishment as set forth above. The trial court rendered judgments of conviction in accordance with the verdicts. Ramos filed a motion for new trial arguing: (1) the court erred by denying his request for an insanity instruction in the jury charge; (2) the court erred by denying his motion for directed verdict; and (3) the verdict was contrary to the law and the evidence. The motion was denied by operation of law, *see* TEX. R. APP. P. 21.8(c), and this appeal

---

[3] According to Vasquez, he started his analysis on February 14, 2018, and completed his report some time that year, but he did not obtain his forensic analyst license until December of 2018. The trial court overruled defense counsel's objections to Vasquez's testimony on these grounds.

[4] Trevino stated she was assigned the case in June of 2018 and obtained her forensic science license in November of 2018. Again, the trial court overruled defense counsel's objection to her testimony on grounds that she was not licensed at the time she performed the analysis.

[5] On appeal, Ramos asserts that his "defensive theory" was that he and Gomez "began to engage in consensual sexual activity, after which [Gomez] demanded money for the activity," and "when [Ramos] refused, [Gomez] pulled a knife on him, and he defended himself, causing the significant injuries." However, Ramos points to no evidence in the record supporting this version of events.

followed.

## II. DISCUSSION

## A. Competency to Stand Trial

By his first issue, Ramos contends the trial court committed reversible error by failing to order a second competency evaluation during trial.

### 1. Applicable Law and Standard of Review

"[T]he conviction of an accused person while he is legally incompetent violates due process." *Pate v. Robinson*, 383 U.S. 375, 378 (1966); *Turner v. State*, 422 S.W.3d 676, 688–89 (Tex. Crim. App. 2013). "A person is incompetent to stand trial if the person does not have: (1) sufficient present ability to consult with the person's lawyer with a reasonable degree of rational understanding; or (2) a rational as well as factual understanding of the proceedings against the person." TEX. CODE CRIM. PROC. ANN. art. 46B.003(a). "A defendant is presumed competent to stand trial and shall be found competent to stand trial unless proved incompetent by a preponderance of the evidence." *Id.* art. 46B.003(b). "If evidence suggesting the defendant may be incompetent to stand trial comes to the attention of the court, the court on its own motion shall suggest that the defendant may be incompetent to stand trial" and "shall determine by informal inquiry whether there is some evidence from any source that would support a finding that the defendant may be incompetent to stand trial." *Id.* art. 46B.004(b), (c). "If after an informal inquiry the court determines that evidence exists to support a finding of incompetency, the court shall order an examination under Subchapter B to determine whether the defendant is incompetent to stand trial in a criminal case." *Id.* art. 46B.005(a).

Here, a competency evaluation was performed prior to trial pursuant to Subchapter

B of chapter 46B of the code of criminal procedure. *See id.* With the parties' agreement, the trial court adopted the evaluator's conclusion that Ramos was competent to stand trial. If a formal competency proceeding results in a finding of competency, "the trial court is not obliged to revisit the issue later absent a material change of circumstances suggesting that the defendant's mental status has deteriorated." *Turner*, 422 S.W.3d at 693 (noting that, "especially when there has been a suggestion of incompetency but no formal adjudication of the issue, due process requires the trial court to remain ever vigilant for changes in circumstances that would make a formal adjudication appropriate"); *Learning v. State*, 227 S.W.3d 245, 250 (Tex. App.—San Antonio 2007, no pet.) ("To justify a second competency hearing, defense counsel would have had to offer new evidence of a change in [appellant]'s mental condition since the first competency hearing.").

We review a trial court's decision not to order a competency examination or conduct a formal competency trial for an abuse of discretion. *See Laflash v. State*, 614 S.W.3d 427, 432 (Tex. App.—Houston [1st Dist.] 2020, no pet.); *Farris v. State*, 506 S.W.3d 102, 110 (Tex. App.—Corpus Christi–Edinburg 2016, pet. ref'd). "A trial court's first-hand factual assessment of a defendant's competency is entitled to great deference on appeal." *Farris*, 506 S.W.3d at 110 (citing *Ross v. State*, 133 S.W.3d 618, 627 (Tex. Crim. App. 2004)).

### 2. Relevant Facts

On appeal, Ramos points to several passages in the trial record which he believes demonstrate a "change of circumstances suggesting that [his] mental status has

11

deteriorated" and necessitating a second competency evaluation.[6] First, the following exchange occurred at the conclusion of the second day of trial testimony:

THE COURT: . . . Let the record reflect that Counsel for the State and Counsel for the Defense is present and the Defendant is present and we're outside the presence of the jury. [To defense counsel:] I've been informed that your client has threatened to kill somebody outside in the hall.

[To Ramos:] I don't know what your problem is but I promise you if you keep up with this behavior, I'm going to gag you. I'm going to sit you down and have you chained throughout the whole trial. Do you understand what I'm telling you? Do you understand what I'm telling you?

THE DEFENDANT: You haven't allowed me to speak.

THE COURT: I'm sorry?

THE DEFENDANT: You didn't say I could speak. You just got mad. You didn't say I could speak.

THE COURT: You want to speak?

THE DEFENDANT: No. You didn't say for me to speak. You just raised your voice. You didn't ask me to speak.

THE COURT: You cannot speak to anybody but your attorneys.

THE DEFENDANT: You didn't ask me—

THE COURT: If you want to testify, you can testify from here. If you say one more word to me, I'm going to hold you in contempt.

THE DEFENDANT: If I'm in contempt, that's fine.

THE COURT: You're held in contempt for six months.

---

[6] As the State observes, Ramos does not provide any record citations in the argument section of his brief concerning his first, second, or third issues. *See* TEX. R. APP. P. 38.1(i) (requiring the argument section to contain "appropriate citations to . . . the record"). However, he does extensively cite the record in the statement of facts section of his brief. We address the issues out of an abundance of caution and in our sole discretion.

THE DEFENDANT:     If I'm going to get 50 years—

THE COURT:     That's another six months.

THE DEFENDANT:     (Spanish).

THE COURT:     That's another contempt, 18 months.

THE DEFENDANT:     (Spanish).

THE COURT:     That's 24 months—

THE DEFENDANT:     (Spanish).

THE COURT:     —you're held in contempt.

THE DEFENDANT:     (Spanish).

THE COURT:     That's 30 months in contempt.

Gag him—I want him gagged from now on.

THE DEFENDANT:     You asked me to speak.

THE COURT:     Shut up. I said shut up.

THE COORDINATOR:     Deputy, take him downstairs, please.

THE COURT:     I want him gagged.

(Whereupon the Defendant was removed from the courtroom.)

(Recess.)

THE COURT:     Okay. We're back on this case. We're outside the presence of the jury. It's the State of Texas versus Andrew Ramos. During the break there was an outburst by the Defendant. Then the Court found he was in direct contempt because he kept on talking after I told him to be quiet. So I held him in contempt and told him not to say another word but [he] kept on talking. I've issued 30 months contempt on this case. I'm going to recess the jury until tomorrow at 8:30. I want to start [at] 8:30.

Your client will be down there by 7:45 or so. If he continues disrupting the proceedings or the Court or threatening people, I will gag him. Otherwise, I

13

|  |  |
|---|---|
|  | will put him in a separate room and try to find a monitor to where he can have access to the proceedings. Counsel for the Defense, I would ask that you do some research and if gagging is improper let me know. If you can't keep him quiet and follow the Court's decorum and proceedings, then I've got to take action. |
| [Co-defense counsel]: | Sure. And we will make that determination in the morning, Judge, when we talk to him and we will report back to the Court. Our preference is to not have him gagged in front of the jury because it would be highly prejudicial. I would prefer Your Honor's suggestion or even the alternative to absent himself from the trial because of his outburst, and it's already on the record. So it was his actions that caused him to be— |
| THE COURT: | I'm just confident that I've got two experienced Defense lawyers that can talk to him. |
| [Co-defense counsel]: | Sure. |
| THE COURT: | And if anybody can do it, you can. That's why you were appointed in this case. You're the fourth lawyer involved—you're the fourth set of lawyers involved in this case and nobody has been able to handle this gentleman. My observations during the trial is that he's done all kinds of gestures with his hands and he's smiling and just—I don't know. I mean something— |
| [Co-defense counsel]: | Sure. |
| THE COURT: | —weird is wrong with this particular situation. |
| [Co-defense counsel]: | Sure. |
| THE COURT: | He is smiling when the victim is testifying. He is smiling when he sees pictures. I mean it really concerns me. It really does. |

Ramos next points to the following exchange which took place during Gomez's testimony the following day:

| | |
|---|---|
| THE DEFENDANT: | Don't touch my thigh. Why did you touch my thigh? You touched my thigh. |

14

| | |
|---|---|
| [Defense counsel]: | Your Honor, can we take a break? |
| THE COURT: | Let's take a break. |
| THE COORDINATOR: | All rise for the jury. |
| | (Whereupon the jury left the courtroom at 10:48.) |
| THE COURT: | I want the record to reflect that the accused was shaking his head back and forth uncontrollably. I don't know what the issue is. Gentlemen, do you know what the issue is? |
| [Defense counsel]: | Your Honor, it's my fault. Earlier I had brought him some water. |
| THE COURT: | Uh-huh. |
| [Defense counsel]: | He drank the water. I had permission. |
| THE COURT: | Okay. |
| [Defense counsel]: | And when they were asking—[co-defense counsel] was asking questions I moved my hand accidentally touching his thigh and he reacted. |
| THE COURT: | Okay. |
| [Defense counsel]: | But it was my fault. |
| THE COURT: | All right. |
| THE DEFENDANT: | Do you want to know why I was shaking, Judge? |
| THE COORDINATOR: | Sir, if he is not speaking to you, then you don't talk to him, okay? |

Later during Gomez's testimony, Ramos began to ask a question and after the trial court instructed him not to talk, Ramos falsely stated, "I'm an attorney."

After the State rested its case-in-chief and the trial court denied defense counsel's request for a directed verdict, the trial court called Ramos to the witness stand, and the following colloquy occurred outside the presence of the jury:

| | |
|---|---|
| THE COURT: | Okay, sir. You've been here throughout the whole |

trial, correct?

THE DEFENDANT: Based on—

THE COURT: You paid attention—

THE DEFENDANT: —the breaks, no.

THE COURT: You paid attention to it?

THE DEFENDANT: Based on the breaks I haven't been here all the time.

THE COURT: You understand what's going on?

THE DEFENDANT: When I'm here but when I'm not here—when I'm not here I haven't heard anything.

THE COURT: Listen to my question and we will finish this pretty quickly. Are you satisfied with your attorneys, sir?

THE DEFENDANT: My attorneys, yes.

THE COURT: Okay.

THE DEFENDANT: How is that—

THE COURT: Now, let me ask you a question. You have the right to testify or you have the right not to testify. My question to you is do you wish to testify?

THE DEFENDANT: I don't have a problem speaking but you get mad at me when I speak. You gave me contempt for not even speaking. And if I spoke—

THE COURT: [Defense counsel], did you discuss his rights with your client?

[Defense counsel]: Your Honor, I did visit with him. When I asked the Court to bring him on Friday, the day he filled out the Application for Probation,—

THE COURT: Yes.

[Defense counsel]: —we went over this situation and how the Court was going to proceed and what was going to happen, and that he had a right to testify and also a right not to testify. And at that point he told me he wasn't going to testify.

16

| | |
|---|---|
| THE COURT: | Okay. Thank you. |
| [Defense counsel]: | And not only that, Judge, the last time we met and it has the date 2021, I think it was March, [co-counsel] and I went to the jail and at that time the virus, I think was not in place yet. It could have been but anyway we discussed it. We were asking for a jury trial and he was not going to testify. |
| THE COURT: | Okay. You may have a seat. |
| THE DEFENDANT: | Your Honor, he gave me probation, and I don't know why you're asking me questions here. |
| THE COURT: | Sir, you've got attorneys to answer your questions. |
| THE DEFENDANT: | No. I'm asking you a question. |
| THE COURT: | No. I'm not going to answer it. |
| THE DEFENDANT: | He gave me probation because you agreed and then— |
| THE COURT: | I'm not your attorney. |
| THE DEFENDANT: | Okay. |
| THE COURT: | Have a seat, sir. Have a seat. |
| THE DEFENDANT: | You asked me to talk to you and you keep fighting me. |
| THE COURT: | My question to you is do you want to testify. It's as simple as that. |
| THE DEFENDANT: | You gave him to give me probation [sic]. |
| THE COURT: | Do you want to testify? |
| THE DEFENDANT: | You gave me probation papers, Your Honor. You gave me probation papers for me to sign. |
| THE COURT: | Do you understand the question, sir? |
| THE DEFENDANT: | Yes, sir. |
| THE COURT: | Okay. |

THE DEFENDANT:      But I'm from Haiti, okay, it's different. I really am from Haiti. And you gave me probation papers, and I said, yes. And now you're mad at me for speaking correctly.

THE COURT:          Why am I mad at you?

THE DEFENDANT:      You asked me correctly and he gave me probation papers and you agreed and now I'm here on trial. Probation and trial are two different things.

THE COURT:          I only have one question for you.

THE DEFENDANT:      What?

THE COURT:          Do you wish to testify?

THE DEFENDANT:      I don't have any objections. Your Honor, is there a problem if I don't speak?

[Co-defense counsel]:  Your Honor, I think he understands. We explained to him in detail. He has been able—he's been very lucid all this time. He's been able to communicate with us and he's been able to assist us in rendering an effective assistance of counsel throughout the trial and pretrial. At this time, Your Honor, based on our conversation with him, he does not wish to testify.

THE COURT:          Okay. Thank you.

[Co-defense counsel]:  Thank you.

THE COURT:          You may be seated.

THE DEFENDANT:      Okay, Your Honor. My answer is, no, okay.

THE COURT:          All right. Be seated, sir.

The following day, while the court coordinator was reciting language from the jury charge and verdict form instructing the jury to find Ramos either guilty or not guilty, Ramos stated: "If they are already pleading me not guilty, Your Honor, can I go home?" Shortly thereafter, while the coordinator was reading a definition of aggravated sexual assault

18

from the jury charge, Ramos again interrupted as follows:

THE DEFENDANT: They didn't charge me for (inaudible)—

THE COURT: Ladies and gentlemen, let's take a quick break.

THE COORDINATOR: All rise for the jury.

THE DEFENDANT: Don't touch me. I'm asking you not to touch me (Spanish). Don't touch me. I am okay. I am a legal expert and I can speak (Spanish).

(Whereupon the jury left the courtroom at 9:23.)

THE COURT: Close the door, please. Let the record reflect that the accused has made an outburst in court. It's not the first time or not the second time or not the third one.

THE DEFENDANT: I asked you not touch me (Spanish).

[Defense counsel]: For the Defense we're asking that because of his actions that he be removed back to the holding cell and we continue with the case.

THE COURT: All right. I'm going to do that.

THE DEFENDANT: This's not a fair trial, sir.

THE COURT: Can you take him back to the holding cell, deputy.

THE DEFENDANT: Can I go home? If you want to have a trial without me, you can't do that.

THE DEPUTY: Get up.

THE DEFENDANT: All right. I'm going to get up but don't touch me.

THE COURT: Let the record reflect that I am removing—let the record reflect that the Defendant is being removed to the holding cell because he keeps on talking. He keeps on interrupting. We can't proceed that way.

THE DEFENDANT: Well, you keep saying more charges than necessary, manslaughter, intoxication—

THE COORDINATOR: Stop talking, sir.

19

| | |
|---|---|
| THE DEFENDANT: | Your Honor, the person there cannot plead me not guilty or guilty. The only one that can plead me guilty is the jury. So don't ask me (Spanish)— |
| THE COORDINATOR: | Just take him out, please. Don't let him talk anymore. Get him out. |
| THE DEFENDANT: | Hey, Your Honor, he is pushing me. You're pushing me. If you don't stop pushing me, (Spanish)— |
| THE COURT: | Let the record reflect that he made another death threat to— |
| THE BAILIFF: | He said it to the deputy escorting him out. |
| THE COURT: | My bailiff is here. My coordinators are here. They heard that. We just can't proceed orderly with him being in court and him interrupting the proceedings. . . . I don't think the absence of his presence violates any type of due process. So we will proceed without him. |
| [Defense counsel]: | Yes, sir. |

Before the jury was brought back into the courtroom, the trial court asked defense counsel if he wanted the court to "make any kind of comment to the jury not to consider any outburst or do you want me to leave it alone?" Counsel replied, "I think based on the fact that they observed his outburst, I don't think the Court needs to amplify it . . . . I think we should just leave it alone." Co-defense counsel then reiterated his agreement "that under the circumstances in this case Your Honor has the discretion to remove [Ramos] from further proceedings in this case."

Ramos additionally points to instances in the record, after Pina's report was filed, in which the trial court seemed to express continuing concern about Ramos's mental state. These instances include the court's remark, set forth above, that Ramos appeared to be smiling during Gomez's testimony. Additionally, at a pre-trial hearing on January 9,

20

2020, the trial court asked Ramos if he had any "mental issues," and though Ramos answered "No," the court then asked defense counsel if the court could send Ramos to a hospital in San Antonio for further evaluation "on [the court's] own motion." Counsel replied that the court could do that, but that Ramos has already been found competent, and Ramos informed the court that he did not want to delay the trial further. Later in the hearing, after being advised that Ramos had an appointment with another evaluator,[7] the court stated: "The first thing I hear that you've been aggressive, I'm going to send you to a mental hospital. I really want to know what's going on in your head, okay. I really do." At another hearing the next day, the court remarked: "I'm considering to commit him to a mental facility and keep him there until he decides to cooperate." However, a second evaluation was never ordered.

### 3. Analysis

Ramos argues that the record excerpts set forth above illustrate that he did not have the ability to consult with his attorneys "with a reasonable degree of rational understanding," and that he did not have "a rational as well as factual understanding of the proceedings" against him. *See* TEX. CODE CRIM. PROC. ANN. art. 46B.003(a). He acknowledges that he had been evaluated and found competent by Pina prior to trial, and that the trial court adopted that finding. However, he contends that his mental condition deteriorated after the time of Pina's evaluation. He notes that, in the "Certificate of Psychological Examination for Mental Illness," Pina specifically anticipated that Ramos would "continue to experience deterioration of [his] ability to function independently" if he

---

[7] Defense counsel stated that "we're prepared to go to trial on the guilt-innocence phase but if there is a punishment phase, we did require an expert to be appointed to assist in mitigation. And so we're waiting on that." The record does not reflect that any additional evaluation was performed.

did not submit to treatment.

We disagree that the court erred in not ordering a second competency evaluation. Most of the incidents Ramos relies upon to show his alleged incompetence involve outbursts, interruptions, threats, and non-responsive answers he gave during trial. "[D]isruptive courtroom conduct and a general failure to cooperate are not probative of incompetence to stand trial." *George v. State*, 446 S.W.3d 490, 501 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd); *see Moore v. State*, 999 S.W.2d 385, 395 (Tex. Crim. App. 1999). "If such actions were probative of incompetence, one could effectively avoid criminal justice through immature behavior." *Moore*, 999 S.W.2d at 395; *see George*, 446 S.W.3d at 501. Pina opined that, though Ramos "demonstrated he may not be able to manage his words, emotions and behavior in the courtroom," he understands the charges against him, is able to provide information about the allegations, and "possesses an ability to rationally apply knowledge to his current case and make decisions in his best interest." The fact that Ramos failed to manage his behavior in court during trial, as Pina anticipated, does not mean that there was a change in circumstances or a deterioration of Ramos's mental condition since Pina's report so as to warrant a new evaluation. *See Grider v. State*, 69 S.W.3d 681, 685 (Tex. App.—Texarkana 2002, no pet.) ("Although Grider's testimony suggests he is impaired to some extent by a psychiatric disorder requiring medication, there was no evidence that such impairment caused Grider to lack sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding or prevented Grider from having a rational as well as factual understanding of the proceedings against him."); *Lingerfelt v. State*, 629 S.W.2d 216, 217 (Tex. App.— Dallas 1982, pet. ref'd) (concluding schizophrenia diagnosis and testimony that appellant

did not know right from wrong was insufficient to demonstrate incompetency).

As Ramos notes, however, in addition to generally behaving in a disruptive and disobedient manner, he also at times made demonstrably false or non-sensical statements to the trial court, including that he is an attorney and that he is from Haiti.[8] Moreover, Ramos at times appeared confused about his application for probation and his not guilty plea, ostensibly indicating he believed they were orders of the court instead of requests made on his behalf by counsel. Arguably, these behaviors may be probative of a lack of a rational, factual understanding of the proceedings. However, the trial court was better positioned to determine the significance of these behaviors, and we give great deference to that determination. *See Montoya v. State*, 291 S.W.3d 420, 426 (Tex. Crim. App. 2009) ("[T]hose who observed the behavior of the defendant at the hearing were in a better position to determine whether she was presently competent."); *McDaniel v. State*, 98 S.W.3d 704, 713 (Tex. Crim. App. 2003) (noting that "the trial court's first-hand factual assessment of appellant's mental competency" and its findings "that appellant understood the nature of the proceedings and assisted his counsel in his defense" are "entitled to great deference by the reviewing court"); *Farris*, 506 S.W.3d at 110. In this regard, it is highly significant that Ramos's defense attorneys repeatedly and consistently vouched for their client's competence throughout every step of the proceedings. And in discussing whether Ramos desired to testify, co-defense counsel stated that Ramos "[ha]s been very lucid all this time" and "[ha]s been able to assist us" in his defense.

The trial court could have rationally determined—from Pina's report, defense

---

[8] As Ramos notes in his appellate brief, "[e]verything on the record suggests he is a natural-born United States citizen."

23

counsel's repeated representations, and the court's own personal observations—that Ramos's false or nonsensical statements did not indicate a deteriorating mental condition or a material change in circumstances since Pina's evaluation, but instead may have been made purposefully in order to obstruct the trial. *See Johnson v. State*, 429 S.W.3d 13, 18 (Tex. App.—Houston [14th Dist.] 2013, no pet.) ("Bizarre, obscene, or disruptive comments by a defendant during court proceedings do not necessarily constitute evidence supporting a finding of incompetency."); *see also Duong v. State*, No. 02-18-00128-CR, 2019 WL 3334426, at *7 (Tex. App.—Fort Worth July 25, 2019, no pet.) (mem. op., not designated for publication) (finding that the trial court could have reasonably concluded that it was facing a disruptive but competent defendant intent on stopping the trial and therefore the trial court did not abuse its discretion by failing to conduct a competency hearing).[9]

For the foregoing reasons, we conclude the trial court did not abuse its discretion in failing to order a second competency evaluation. Ramos's first issue is overruled.

## B.     Removal From Courtroom

By his second issue, Ramos contends that the trial court erred by removing him from the courtroom on two occasions during trial, both of which are illustrated in record excerpts above. *See supra* p. 13, 20.

Under the Confrontation Clause of the Sixth Amendment, a criminal defendant has a general right to be present in the courtroom at all phases of the proceedings against him. *See Illinois v. Allen*, 397 U.S. 337, 343 (1970) (applying U.S. CONST. amend. VI);

---

[9] We note that, though Pina stated that Ramos would "continue to experience deterioration of [his] ability to function independently" if he did not submit to treatment, Ramos does not direct us to any evidence in the record establishing that he in fact failed to submit to treatment.

*see also* TEX. CODE CRIM. PROC. ANN. art. 33.03 ("In all prosecutions for felonies, the defendant must be personally present at the trial . . . ; provided, however, that in all cases, when the defendant voluntarily absents himself after pleading to the indictment or information, or after the jury has been selected when trial is before a jury, the trial may proceed to its conclusion."). However, a defendant may lose this right if, "after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom." *Allen*, 397 U.S. at 343 (citing *Snyder v. Massachusetts*, 291 U.S. 97, 106 (1934) ("No doubt the privilege [of personally confronting witnesses] may be lost by consent or at times even by misconduct.")). A trial court confronted with "disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case." *Id.* When a defendant's behavior is of "an extreme and aggravated nature," that discretion encompasses expulsion from the courtroom. *Kessel v. State*, 161 S.W.3d 40, 45 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd) (citing *Allen*, 397 U.S. at 343). We review a trial court's decision to remove a defendant from the courtroom for abuse of discretion. *See id.*

Examples of conduct found to be of an "extreme and aggravated nature" warranting removal include: (1) repeatedly arguing with the trial court in an abusive manner and threatening to kill the trial judge, *Allen*, 397 U.S. at 339–40; (2) making repeated, nonresponsive, profane, vulgar, and disruptive statements and exhibiting disruptive behavior, *Burks v. State*, 792 S.W.2d 835, 836–37 (Tex. App.—Houston [1st Dist.] 1990 pet. ref'd); (3) ignoring the trial court's warnings not to disrupt the proceedings

25

and engaging in a violent scuffle with the bailiff, *Dotson v. State*, 785 S.W.2d 848, 853–54 (Tex. App.—Houston [14th Dist.] 1990, pet. ref'd); and (4) disrupting the trial by interjecting alleged facts that were not in evidence in front of the jury, and after being warned that continued disruptive behavior would result in removal from the courtroom, insisting to the trial court that his behavior was not disruptive. *Ramirez v. State*, 76 S.W.3d 121, 129 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd).

Ramos's attorneys raised no objections to the trial court's actions in removing Ramos from the courtroom, either contemporaneously or in the new trial motion. *See* TEX. R. APP. P. 33.1. To the contrary, after Ramos was removed on the second day of trial, co-defense counsel stated that, rather than having Ramos gagged in full view of the jury, he would prefer that Ramos "absent himself from the trial" because his outburst is "already on the record." And the next day, defense counsel explicitly asked that, "because of his actions," Ramos "be removed back to the holding cell and we continue with the case." Ramos's second issue lacks merit for this reason alone. *See Woodall v. State*, 336 S.W.3d 634, 644 (Tex. Crim. App. 2011) ("The law of invited error provides that a party cannot take advantage of an error that it invited or caused, even if such error is fundamental. . . . In other words, a party is estopped from seeking appellate relief based on error that it induced.").

In any event, we find that the record in this case demonstrates that Ramos engaged in "disruptive, contumacious, stubbornly defiant" behavior which was of an "extreme and aggravated nature." *See Allen*, 397 U.S. at 343; *Kessel*, 161 S.W.3d at 45. Ramos repeatedly interrupted witnesses and the trial court, even after being warned that he would be gagged or removed from the courtroom if the behavior continued. Further,

26

the trial court stated on the record that Ramos "threatened to kill somebody" on the second day of trial and later made "another death threat" as he was being escorted out of the courtroom. On this record, we cannot conclude that the trial court abused its discretion by removing Ramos from the courtroom. We overrule Ramos's second issue.

## C.    Judicial Bias

By his third issue, Ramos contends that the trial court "demonstrat[ed] significant impartiality [sic] toward [him], depriving him of a fair trial." Whether the trial court denied Ramos due process is a question of law which we review de novo. *See Ex parte Brown*, 158 S.W.3d 449, 453 (Tex. Crim. App. 2005).

Due process requires a neutral and detached hearing body or officer. *Brumit v. State*, 206 S.W.3d 639, 645 (Tex. Crim. App. 2006) (citing *Gagnon v. Scarpelli*, 411 U.S. 778, 786 (1973)); *Earley v. State*, 855 S.W.2d 260, 262 (Tex. App.—Corpus Christi–Edinburg 1993, no pet.); *see* U.S. CONST. amend. XIV; TEX. CONST. art. 1, § 19. But we presume the trial judge was neutral and detached "in the absence of a clear showing to the contrary." *Earley*, 855 S.W.2d at 262.

> [A] judge's remarks during trial that are critical, disapproving, or hostile to counsel, the parties, or their cases, usually will not support a bias or partiality challenge, although they *may* do so if they reveal an opinion based on extrajudicial information, and they *will* require recusal if they reveal "such a high degree of favoritism or antagonism as to make fair judgment impossible." On the other hand, "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women" may display, do not establish bias or partiality.

*Gaal v. State*, 332 S.W.3d 448, 455 (Tex. Crim. App. 2011) (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994) ("A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.")); *see Kemp v. State*, 846 S.W.2d 289, 305–06 (Tex.

Crim. App. 1992) ("[B]efore alleged bias becomes sufficient to warrant the disqualification of a judge, it must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case.").

In addition to the verbal altercations referenced in our discussion of his first issue, Ramos also points to the following remarks in which, he argues, the trial court "displayed significant antagonism" toward him:

- At a pre-trial hearing, after defense counsel represented that the case file "is basically a foot thick," the court remarked: "I can guarantee that 95 percent of that stuff is useless and irrelevant."

- At another pre-trial hearing, after Ramos stated he did not trust his attorney, the court remarked: "Because he is telling you what's in the reports, is that why you don't trust him? . . . There's been problems because you are telling him what the evidence shows?"

- At the same hearing, after Ramos expressed dissatisfaction with his counsel's defense strategy, the court remarked: "I don't see different ways to represent him. . . . I mean, are there defenses there that I missed?"

- At a subsequent pre-trial hearing, after new defense counsel was appointed, the court remarked: "Apparently, I don't think you are going to have a very hard time preparing because he has got a defense already. . . . So you don't have to worry about that. . . . He can prepare the briefs, he can prepare the charge, you don't have to worry about any of that stuff. Cross-examination."

- At yet another pre-trial hearing, after the court denied Ramos's request for a bond reduction and defense counsel requested "house arrest," the court

28

remarked: "He's already on house arrest in [the] Hidalgo County [Jail]. . . . I mean what better house do you need? They feed you. You watch TV. They take you out in the yard once in a while."

- At the same bond reduction hearing, after defense counsel stated that Ramos had been "assaulted several times" while in jail, the court remarked: "Well, according to his record he seems to be a pretty good fighter.[10] . . . It looks like he can defend himself."

- After defense counsel stated "normally it's several people against him," the court remarked: "Officer, I want to order that if they fight with him it's just one on one. I don't want several people jumping on him. . . . Does that help any?"

- At a subsequent pre-trial hearing, after Ramos's court-appointed counsel moved to withdraw on grounds that Ramos "became aggressive towards [him] and made threats," the court asked Ramos: "Do you feel aggressive? . . . There is a lot of people in jail that you can be aggressive with. . . . Do you want me to get you somebody like that?"

- After Ramos stated he became aggressive because his counsel "hit [him] on [his] shoulder," the court remarked: "Based on the prisoners that I'm going to bring up later on, are you going to be aggressive with them?" After Ramos replied "No," the court stated: "Why? Why aren't you going to be aggressive with them? Because they could beat you up, right? They hit you back or are you a tough guy? . . . I can bring all the prisoners up here and they can touch you on the shoulder and we can see what you do. Is that a good deal?"

---

[10] Defense counsel stated that Ramos is a "[G]olden [G]loves boxer."

- After Ramos stated he would cooperate with appointed counsel, and that his counsel was a "good attorney," the trial court asked: "Do you want a babysitter? . . . Do you want any special meals or anything like that?"

The State argues that Ramos failed to preserve this issue for our review because he did not request the trial court's recusal, nor did he argue that the judge was biased or that he was denied a fair trial or due process, at any point before or during trial or in his new trial motion. *See* TEX. R. APP. P. 33.1(a).[11] Assuming but not deciding that the issue is properly before us, we conclude that Ramos's due process rights were not violated.

We observe that some of the complained-of remarks by the trial court were clearly intended to be in jest, and in that regard, the judge at times failed to comply with his duty to "be patient, dignified[,] and courteous to litigants, jurors, witnesses, lawyers[,] and others with whom the judge deals in an official capacity." TEX. CODE JUD. CONDUCT Canon 3B(4), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. B.; *see Lagrone v. State*, 209 S.W. 411, 415 (Tex. Crim. App. 1919) ("The law contemplates that the trial judge shall maintain an attitude of impartiality throughout the trial."). Judges must be cognizant, in particular, that sarcasm does not translate from a cold transcript. But to the extent the

---

[11] Citing *Brumit v. State*, 206 S.W.3d 639, 645 (Tex. Crim. App. 2006), the State argues that "[w]hen an appellant does not make a request, objection, or post[-]trial motion based on the trial judge's alleged bias, the complaint is not preserved for appellate review, and the appellate court may only reverse if said bias resulted in fundamental error." However, the Texas Court of Criminal Appeals has disavowed the concept of "fundamental error" as a freestanding, harm-based doctrine of error preservation. *See Proenza v. State*, 541 S.W.3d 786, 793 (Tex. Crim. App. 2017). Instead, courts continue to apply the rules of error preservation established in *Marin v. State*, 851 S.W.2d 275 (Tex. Crim. App. 1993). *Proenza*, 541 S.W.3d at 793–97. Under the *Marin* framework, rights are placed in one of three categories: "(1) absolute requirements and prohibitions; (2) rights of litigants which must be implemented by the system unless expressly waived; and (3) rights of litigants which are to be implemented upon request." *Id.* at 792 (quoting *Marin*, 851 S.W.2d at 279). Procedural default applies only to the third category of rights. *Marin*, 851 S.W.2d at 279. On the other hand, category-one *Marin* rights are "systemic requirements and prohibitions" that "are essentially independent of the litigant's wishes" and cannot be forfeited or waived. *Id.* And category-two rights "must be protected by the system's impartial representatives unless expressly waived by the party to whom they belong." *Id.* The Texas Court of Criminal Appeals has not categorized the right to an unbiased and impartial judge, and the parties do not address that issue in their briefs.

court displayed antagonism toward Ramos, there is no suggestion that such antagonism was based on extrajudicial information or any other improper source; instead, it appears to have been rationally based on Ramos's contumacious behavior during the proceedings, as recounted by his attorneys and as personally observed by the trial court. Overall, we cannot say that the record shows that the court harbored a "deep-seated favoritism or antagonism that would make fair judgment impossible." *See Gaal*, 332 S.W.3d at 455 ("Although intemperate remarks may well violate a rule of judicial conduct, such a violation does not necessarily mean that the judge should be recused."). We overrule Ramos's third issue.

## D. Ineffective Assistance of Counsel

By his fourth issue, Ramos argues his trial counsel provided ineffective assistance by "failing to advocate for an assessment of [his] competence," and by "assisting the trial court in removing [him] from the courtroom at critical stages of the trial."

The United States and Texas Constitutions guarantee a criminal defendant the right to reasonably effective assistance of counsel. U.S. CONST. amend. VI; TEX. CONST. art. I, § 10; *see* TEX. CODE CRIM. PROC. ANN. art. 1.051; *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To obtain a reversal of a conviction on grounds of ineffective assistance of counsel, an appellant must show: (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's deficient performance prejudiced the defense, resulting in an unreliable or fundamentally unfair outcome of the proceeding. *Davis v. State*, 278 S.W.3d 346, 352 (Tex. Crim. App. 2009) (citing *Strickland*, 466 U.S. at 687). "Deficient performance means that 'counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'"

*Ex parte Napper*, 322 S.W.3d 202, 246 (Tex. Crim. App. 2010) (quoting *Strickland*, 466 U.S. at 687). "The prejudice prong of *Strickland* requires showing 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* at 248 (quoting *Strickland*, 466 U.S. at 694). "Any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

The burden is on the appellant to prove ineffective assistance of counsel by a preponderance of the evidence. *Id.* The appellant must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance and that his actions could be considered sound trial strategy. *See Strickland*, 466 U.S. at 689. "We commonly assume a strategic motive if any can be imagined and find counsel's performance deficient only if the conduct was so outrageous that no competent attorney would have engaged in it." *Andrews v. State*, 159 S.W.3d 98, 101 (Tex. Crim. App. 2005). Counsel's effectiveness is judged by the totality of the representation, not by isolated acts or omissions. *Thompson*, 9 S.W.3d at 813.

> One necessary facet of professional assistance is the investigation of the facts and law applicable to a case. Counsel has a duty in every case to make a reasonable investigation or a reasonable decision that an investigation is unnecessary. When assessing the reasonableness of an attorney's investigation, a reviewing court must consider the quantum of evidence already known to counsel and whether the known evidence would lead a reasonable attorney to investigate further.

*Ex parte LaHood*, 401 S.W.3d 45 (Tex. Crim. App. 2013).

Ramos relies principally on *LaHood* in arguing that his attorneys' performance was deficient. *See id.* In that case, the defendant's counsel provided an affidavit stating that her client has a "misogynistic attitude with a need to dominate and exercise control over

women," is a "malingerer," and "engaged in . . . antics designed to create the illusion of incompetency, but which appeared to be nothing more than an act." *Id.* at 50. Records showed that the defendant had "an alcohol dependency problem, was bipolar," and was prescribed several psychoactive medications. *Id.* at 51. Counsel conceded that the medications prescribed to her client are typically prescribed to "persons who have been found 'incompetent, but who have a substantial probability of regaining competency' through the use of medications." *Id.* At trial, "new signs" of the defendant's "potential mental instability," arose, including his engaging in "multiple outbursts," claiming "that he was not receiving his required psychoactive medications in jail," complaining "that he was having difficulty understanding the proceeding," and claiming "that he was seeing lights blink." *Id.* Nevertheless, counsel stated she believed her client was competent to stand trial and did not request a competency evaluation.

The *LaHood* Court found that trial counsel's "failure to further investigate" her client's mental health issues "was unreasonable under the circumstances" and constituted deficient performance. *Id.* at 52. The Court observed that "the statutory duty of a judge to suggest that a defendant may be incompetent to stand trial should not be confused with counsel's obligation to make a reasonable decision to investigate and to raise relevant issues to protect the client," and "[t]his is especially so when counsel's belief as to a medical issue is based on her own lay opinion, even though she knew [defendant] had mental-health issues in the past and was taking medications that gave him, in her estimation, a 'substantial probability of regaining competency.'" *Id.* at 50. Ramos argues that the performance of his trial attorneys was similarly deficient because they failed to "investigate" his mental health issues despite the "numerous instances of [his] exhibiting

33

behavior that strongly indicated he was incompetent to stand trial."

We disagree. Ramos did not allege ineffective assistance of trial counsel in his new trial motion, and therefore, the record is silent as to the reasons for his trial attorneys' actions and non-actions. This contrasts with *LaHood*, which was a habeas corpus proceeding with a fully developed record. *See id.* In particular, there is nothing in the record in this case establishing that Ramos's trial attorneys actually failed to adequately investigate their client's mental health and competency to stand trial, even after Pina's report was filed and the trial court found him competent. Instead, as noted above, the attorneys repeatedly confirmed during trial that Ramos was able to effectively consult with them and that he had a rational and factual understanding of the case, notwithstanding Ramos's improper and occasionally bizarre comments. As to Ramos's removal from the courtroom, we have already concluded that the trial court's decision was justified by Ramos's behavior, and defense counsel's decision to agree to the removal may have been a viable strategic choice, considering the circumstances. *See Strickland*, 466 U.S. at 689. The record does not "firmly" support a finding of deficient performance. *See Thompson*, 9 S.W.3d at 813. Therefore, the first *Strickland* prong is not satisfied, and we need not consider the second prong. *See* TEX. R. APP. P. 47.1.

Ramos's fourth issue is overruled.

## E. Admission of Evidence

In three separate issues, Ramos complains about the trial court's admission of evidence. "We review a trial court's ruling on the admissibility of evidence under an abuse of discretion standard, and we must uphold the trial court's ruling if it was within the zone of reasonable disagreement." *Wells v. State*, 611 S.W.3d 396, 427 (Tex. Crim. App.

2020).

By his sixth issue, Ramos argues the trial court erred by admitting records from Gomez's SANE examination during Aguirre's testimony. He contends that, though "SANE records are routinely admitted as medical records, and therefore classified as non-hearsay pursuant to Texas Rule of Evidence 803(4)," "[t]his is a mistake because the nature of SANE records, and the testimony that accompany them, are not neutrally obtained." He contends instead such records are unreliable as medical records because "the entire point of the forensic nurse is to gather and develop evidence to assist law enforcement efforts." He points to Aguirre's testimony at trial that the purpose of obtaining information from a victim is "[t]o collect evidence and identify injuries."

Hearsay—i.e., an out-of-court statement offered to prove the truth of the matter asserted—is generally inadmissible. TEX. R. EVID. 801, 802. But under Texas Rule of Evidence 803(4), "a statement made for, and that is reasonably pertinent to, medical diagnosis or treatment; and describes medical history; past or present symptoms or sensations; their inception; or their general cause" is not excluded by the rule against hearsay. TEX. R. EVID. 803(4). "Rule 803(4) is premised on the patient's selfish motive in receiving proper medical treatment; therefore, the proponent must establish that the declarant's frame of mind when making the hearsay declaration 'was that of a patient seeking medical treatment.'" *Taylor v. State*, 268 S.W.3d 571, 583 (Tex. Crim. App. 2008) (quoting *United States v. Gabe*, 237 F.3d 954 (8th Cir. 2001)); *see Franklin v. State*, 459 S.W.3d 670, 676 (Tex. App.—Texarkana 2015, pet. ref'd) (noting that the Rule 803(4) hearsay exception "is based on the assumption that the patient understands the importance of being truthful with the medical personnel involved to receive an accurate

diagnosis and treatment"). But, in the context of an emergency medical examination, "it seems only natural to presume that adults . . . will have an implicit awareness that the doctor's questions are designed to elicit accurate information and that veracity will serve their best interest." *Taylor*, 268 S.W.3d at 589. In such a situation, we review the record "not for evidence of such an awareness, but for any evidence that would *negate* such an awareness, even while recognizing that the burden is on the proponent of the hearsay to show that the Rule 803(4) exception applies." *Id.*

We find no abuse of discretion in admittance of the records at issue. Aside from Aguirre's testimony that one of the purposes of a SANE exam is to "collect evidence," Ramos points to nothing in the record establishing that Gomez, as the subject of an emergency medical examination after being sexually and physically assaulted, was unaware that it was in her best interest to answer Aguirre's questions truthfully.[12] *See id.* Therefore, the records from the SANE examination were admissible as medical records under Rule 803(4). We overrule Ramos's sixth issue.

By his fifth issue, Ramos argues that the testimony of DNA analysts Vasquez, Flores, and Trevino was erroneously admitted because they were not licensed by the Texas Forensic Science Commission at the time they performed at least some of the analysis at issue. *See* TEX. CODE CRIM. PROC. ANN. art. 38.01, § 4-a ("A person may not act or offer to act as a forensic analyst unless the person holds a forensic analyst license."); *see also id.* art. 38.23(a) ("No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the

---

[12] Ramos neglects to mention that, when Aguirre was directly asked whether the "purpose" of a SANE exam is to "collect evidence for a crime," she replied: "The evidence is turned over to law enforcement but that is not the purpose of the exam."

Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.").[13] By his eighth issue, Ramos contends the trial court erred by admitting evidence, including a police bodycam recording, of statements he made to police following his apprehension at the hotel because he was not given *Miranda* warnings or their statutory equivalent. *See Miranda v. Arizona*, 384 U.S. 436 (1966); TEX. CODE CRIM. PROC. ANN. art. 38.22, §§ 2, 3. With respect to both issues, however, Ramos does not discuss in his brief why or how the admission of the subject evidence caused him to suffer harm. *See* TEX. R. APP. P. 44.2 (standard for reversible error in criminal cases); *see also* TEX. R. APP. P. 38.1(i) (requiring an appellant's brief to contain "a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record"). We overrule both issues for that reason.

## F. Improper Argument

Finally, by his seventh issue, Ramos contends that, during closing argument at the punishment phase of trial, the prosecutor "improperly made reference to parole law as it applied to [him] specifically." His complaint pertains to the following argument:

> I just want to remind you of a few things in this charge. In each of the charges you're going to see that the Defendant has to do half of his time before he is eligible for parole, okay. So if the Defendant was sentenced to 40 years, that means that he will have to serve 20 years before he has parole eligibility. That doesn't mean they're going to be granted parole but it means that they're going to be considered for parole. The other thing about the charge that I want you to remember is—and when you go back and you think about the language in the indictment, we talked about one criminal episode, okay. And so despite the fact that he has been convicted of six counts, they're all from the same criminal episode. So that means that those sentences, all of them, have to run concurrently. They run at the same

---

[13] In response to Ramos's fifth issue, the State argues that the licensing requirement at issue was not effective at the time the witnesses performed their analysis. *See* 37 TEX. ADMIN. CODE § 651.201(c) ("Under Article 38.01 §4-a(b), Code of Criminal Procedure, a person may not act or offer to act as a forensic analyst unless the person holds a Forensic Analyst License, effective January 1, 2019."). We need not decide the issue in light of our conclusion above.

time. There is no what we call sta[c]king. A defendant is not going to go and serve 20 years on one of these counts and then serve another 20 years, okay. They run at the same time because it's the same criminal episode.

Article 37.07, § 4(a) of the code of criminal procedure requires that the jury be given certain instructions about parole eligibility, including: "It cannot accurately be predicted how the parole law might be applied to this defendant if sentenced to a term of imprisonment, because the application of that law will depend on decisions made by parole authorities," and "You may consider the existence of the parole law. You are not to consider the manner in which the parole law may be applied to this particular defendant." *See* TEX. CODE CRIM. PROC. ANN. art. 37.07, § 4(a). "Consequently, it is improper for a prosecutor to apply [parole] law to the defendant on trial during jury argument." *Jaramillo Perez v. State*, 994 S.W.2d 233, 237 (Tex. App.—Waco 1999, no pet.). That said, it is not improper for a prosecutor to "accurately restate the law given in the jury charge" or "to ask the jury to take the existence of that law into account when assessing punishment." *Hawkins v. State*, 135 S.W.3d 72, 84 (Tex. Crim. App. 2004).

Ramos argues that "the State improperly implied that the jury could only ensure that [he] would serve a desired sentence by keeping in mind that he would be eligible for parole at some point." We cannot conclude that the State's argument was improper. Instead, it was an accurate restatement of the parole law and the law governing cumulation of sentences. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07, § 4(a); TEX. PENAL CODE ANN. § 3.03(a) (providing, with certain exceptions not applicable here, that "[w]hen the accused is found guilty of more than one offense arising out of the same criminal episode prosecuted in a single criminal action, . . . the sentences shall run concurrently"); *Hawkins*, 135 S.W.3d at 84. The argument did not apply parole law to Ramos specifically, nor did it encourage the jury "to consider the manner in which the parole law may be

applied to" him." *See* TEX. CODE CRIM. PROC. ANN. art. 37.07, § 4(a); *Jaramillo Perez*, 994

S.W.2d at 237. We overrule Ramos's seventh issue.

### III.    CONCLUSION

The judgments of conviction are affirmed.

DORI CONTRERAS
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed on the
21st day of December, 2023.